[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I. The Dissolution of the Marriage
It is found that all of the allegations of defendant's cross complaints have been proven, that the marriage has broken down irretrievably, and the marriage is ordered dissolved for that reason.
II. The Determination of Disputed Value of Property
(All real estate is held in joint tenancy by the parties.)
 A. No. 283 West Thames Street, Norwich, CT together with a restaurant known as P.D.Q.'s situated thereon.
This property, consisting of a restaurant with a trailer in the rear, together with accompanying land and parking area is presently under lease to a third party.
Peter R. Marsele, who appraised the property on behalf of the plaintiff valued the premises at $189,000 without the lease and in the range of $275,000-$300,000 with it.
Ernest J. Lavissiere, appraiser for the defendant valued the premises at $182,000 and the business with the existing lease at $112,000 for a total of $294,000.
This court finds the total value of the real estate together with the business and lease to be $290,000.
 B. Two family house and barn together with three acres of land situated at 57 Lake Street, Bozrah, Connecticut
The above tract is a portion of an 18-acre parcel situated on Lake Street.
Peter R. Marsele, plaintiff's appraiser, valued the farmhouse and buildings and two acres of land at $133,000 and the remaining sixteen acres at $182,000 for a total of $315,000. This figure represented a decline in value of about 1/2% per month from his original appraisal of $332,000 for the entire parcel on April 2, 1991. He testified that the excess acreage had a value of $12,000 per acre.
Ernest J. Lavissiere, appraiser for defendant, valued the house, outbuildings and three acres of land at $130,000. He also commented that a value of $10,000-$12,000 for the additional acreage "was not out of line."
This court determined the value of the farmhouse and CT Page 791 buildings to be $102,000 and the accompanying three acres to be $36,000 for a total value of $138,000.
 C. Fifteen Acres of Vacant Land on Lake Street, Bozrah, CT. Adjacent to the farmhouse at #57 Lake Street.
As stated in paragraph II. B above, the appraisers of the parties are in substantial agreement that the value of the additional acreage adjacent to the farmhouse is $12,000 per acre. On the evidence the court determines the value of this parcel to be $12,000 per acre or $180,000.
D. Acorn Acres: 103 acres of land, together with all building and improvements therein and appurtenance thereto including the going business of campsite rentals (excluding only a ten acre parcel of land abutting the above 103 acres, fronting on Lake Street and designated per convenience of the court as the Christmas Tree lot.)
The testimony varied as to the exact number of campsites on this tract, ranging from 187 to 213.
Edgar Russ, appraiser for plaintiff valued the entire complex including the going business and 113 acres of land at $990,000. As this computation included the 10 acre Christmas Tree lot, and as Edgar Russ valued the unimproved acreage at $4500 per acre, the court concluded that his value for the 103 acre parcel under consideration would be $945,000.
The testimony of Ernest J. Lavissiere, defendant's appraiser presents more of a problem both in comparing his value of Acorn Acres with those of Mr. Russ and in integrating his findings with the decision of the property into the parcels established by the court. Mr. Lavissiere made three basic findings: Farmhouse and 3 acres, $130,000; camp 50 acres, and business, $634,000; 78 additional acres including land fronting on Lake Street at $2900 per acre — $226,000 for an overall total of $990,000 for all the Bozrah property
Having taken into consideration all of the testimony of both appraisers, the discrepancies in the testimony of the various witnesses concerning the actual number of campsites, and the obvious difference in value between the improved campsite acreage and the unimproved adjacent land, the court determines the value of the entire operation together with 103 acres of land to be $840,000.
 E. The Christmas tree lot together with 10 acres of land abutting on Lake Street. CT Page 792
Edgar Russ, plaintiff's appraiser, testified that this parcel could be sold immediately and placed a value of $4500 per acre on it for a total value of $45,000.
Ernest J. Lavissiere for defendant valued the acreage at $2900 per acre regardless of "whatever the purchaser could use it for." Later, referring to the Christmas tree lot, he stated "this parcel should have a higher value," on all the evidence the court values this parcel at $4500 per acre for a total value of $45,000.
III. The values of the properties in dispute having been established, a list of the assets of each of the parties is set forth below to facilitate the final distribution of the marital estate by the court.
Plaintiff's Marital Assets:
280 W. Thames St., Norwich, CT and P.D.Q. Restaurant $290,000 Mortgage 140,900 ------- Total Equity 149,100
1/2 interest of plaintiff $74,550
Two family farmhouse and 3 Acre, #57 Lake Street, Bozrah, CT $138,000 1/2 interest of plaintiff 69,000
15 Acres of vacant land, Lake Street Bozrah, CT 180,000 1/2 interest of plaintiff 90,000
Acorn Acres, 103 Acres and business 840,000 1/2 interest of plaintiff 420,000
Christmas Tree lot — 10 acres 45,000 1/2 interest of plaintiff 22,500
Wallingford Pond Road, East Wallingford, CT — 357 Acres and improvements 155,000 1/2 interest of plaintiff 77,500
Bank Accounts 3,300
1991 Jeep —
Stocks, bonds etc. including stock in CT Page 793 P.D.Q. and Acorn Acres 64,000
I.R.A. 19,000
Silver, asbestos settlement, disputed claim of loss at P.D.Q. through fire 6,900
Gun collection, coin collection, tools —
Antiques (Schedule b) —
Acorn Acres Equipment (tractor, golf carts mowing equipment, 80 Chev. P/U) 1/2 8,000
Union Pensions — -------- $854,750
Defendant's Marital Asset
280 W. Thames St., Norwich, CT and P.D.Q. restaurant 1/2 equity 74,550
2 family farmhouse plus 3 Acres 57 Lake Street, Bozrah, CT 1/2 equity 69,000
15 AC: vacant land, Lake St. 1/2 equity 90,000 Bozrah, CT
Acorn Acres, 103 Acres and business 1/2 equity 420,000
Christmas Tree lot — 10 acres 1/2 equity 22,500
Wallingford Pond Rd. East Wallingford, VT, 357 acres and improvements 1/2 equity 77,500
Household furniture, furs, jewelry —
Bank accounts 9,754
Stock in Acorn Acres, P.D.Q. 4,438 including bank balance of $4,438
Life Insurance (CSV) 1,181 CT Page 794
I.R.A. (2) 37,303
Cash on hand 195
Acorn Acres Equipment (1/2) 8,000
1990 Buick Riviera (Equity) 11,923
1986 Jeep — ------- 826,344
Total Marital Estate $1,681,094
IV. The evaluation of the evidence in accordance with the provisions of Sec. 46b-81c C.G.S.
The plaintiff husband, who is 61 years of age, and the defendant wife, who is 59, were married on June 21, 1958, more than 33 years ago. There were no children issue of the marriage, the defendant having undergone a hysterectomy early in the marriage. The parties separated in May, 1989, 2 1/2 years ago, and this action was commenced the following month.
Plaintiff, upon graduation from high school was employed as a plumber. Later, after his discharge from naval service, he attended Mitchell College where he met the defendant in 1954. Thereafter he attended the University of Connecticut for 3 1/2 years but did not graduate. Defendant meanwhile continued her education at Mitchell College and at Eastern Connecticut State University, but did not obtain a degree. During this period the courtship of the parties continued, culminating in their marriage in 1958. At this time, plaintiff was employed as a journeyman plumber and defendant was a full time physical education instructor at Norwich Free Academy — and in her spare time worked as a waitress in various area restaurants.
The parties brought little, if anything in the way of marital assets into their marriage, but by virtue of wise business decisions and long hard physical labor they managed over the years to amass a marital estate of over 1.6 million dollars. About 1960, they purchased a home and adjoining acreage in Bozrah for $12,000. Together they cleared the land, planted countless Christmas trees, burned brush, sold apples and cider, all in addition to their regular daily employment. Their crowning success was Acorn Acres, a family campground of about 110 acres near their home in Bozrah, which they purchased as raw land in 1967 for $15,000 and developed into a thriving vacation community with about 200 campsites, a recreation hall, store, olympic size swimming pool, tennis courts, and endless CT Page 795 other sports facilities for the use of their patrons.
The parties agree that it was plaintiff who first suggested that the pasture and woodland they had purchased be transformed into a campground. The evidence also indicates that defendant recognized a good idea when she heard one. Trees were cut down, the wood was sold, roads were built, wells were dug, buildings were erected, electricity was installed, and the business was started with 10 campsites. As the years passed the improvements increased as did the demand for campsites by satisfied tenants. At the present time there are about 200 sites with electrical hook-ups and almost all of these with water.
While the joint efforts of the parties brought plaintiff's inspired plan for a campground to fruition in its early years, it was the dogged determination and untiring efforts of the defendant that brought the success it enjoys today. In the words of plaintiff "Sis (defendant) handled all the finances. I never made out more than a dozen checks during the marriage." Defendant described a typical day at Acorn Acres as beginning at 8:00 a.m. with the opening of the store followed by posting the daily schedule of events, paying bills, taking reservations, gasing the golfcarts, supervising a dozen employees, checking the pool, recording deposits, closing the store at 10:00 p.m. after which she would police the area, making certain that no parking problems existed and that all campfires were out. At midnight she retired. This routine was followed seven days a week during the summers. She was only slightly less busy during the winter months, supervising normal upkeep and needed improvements, interspersed with arranging New Year's, St. Patrick's Day and other parties and get togethers as a way of retaining the interest of the campers during the out-of-season months.
During these years plaintiff was employed full time elsewhere, first as a master plumber and later as business agent for three plumber's unions. Joan Weir, a ten-year employee of Acorn Acres, testified as follows: "The only thing I saw Mr. Quinn do was open and close the pool at the start and end of the season." Another fifteen year employee, Christa Clark stated "Mrs. Quinn did everything — she picked up garbage, cleaned bathrooms, took phone calls — twenty four hours a day. Mr. Quinn didn't do much. Occasionally, he'd pump propane gas or work on the plumbing. He'd be there 10-15
days during the summer." Finally, Eileen Henry, who worked at Acorn Acres from 1978 to 1985 testified "I'd see Mrs. Quinn picking up the papers at 7:30 a.m. and picking up around there at 11:30 p.m. I'd see Mr. Quinn on the grounds twice every summer — he never did anything at the camp." CT Page 796
P.D.Q.'s Restaurant
In 1983, the parties purchased a restaurant in Norwich for $256,000. It was later named P.D.Q.'s, representing plaintiff's initials. In plaintiff's words "the idea of purchasing the restaurant was basically mine. We hired a manager to run it. Acorn Acres money and my paycheck paid for the improvements." The project has been only moderately successful. A fire caused the restaurant to close for a long period of time, and only recently has it been rebuilt and a new tenant been installed. Plaintiff testified at length concerning the income from the business, being highly critical of defendant's manner of handling the finances of the restaurant.
During the operation of this business plaintiff was for the most part engaged in union activities, while defendant spent her time at Acorn Acres. Mary Ann Daly, a former bartender there for 3 1/2 years testified that during the winter months defendant would come in, bus the tables, wash glasses, scrub the walls and floors, pick up bottles and cans in the parking lot." She'd do a little bit of everything — she was there five nights a week in winter — the summer it was sporadic — she'd come down there around 11:00 p.m." With reference to the plaintiff's contributions to this joint effort, she stated "Mr. Quinn came in to eat. He would meet friends at the bar. I never saw him perform any tasks at the restaurant." Bernadette Parks, hired by plaintiff to manage the restaurant in 1984 testified that "Mrs. Quinn was there a few times a week — she sat people, worked the cash register, helped in the kitchen. If I had a day off, she would take my place." Concerning plaintiff's assistance she said "Mr. Quinn came in to eat — once he fixed some pipes for the dish washer even when he was unemployed for two years he didn't help out.
Here again the evidence is clear that plaintiff contributed the idea and his name for the restaurant, while the defendant contributed all the sweat equity.
The Vermont Property:
In 1981, the parties jointly purchased a logging camp together with 357 acres of land in an area of East Wallingford, Vermont designated as a national forest. Plaintiff has used it for hunting and fishing and defendant has been there in winter months snowmobiling with her girlfriends. A cabin on the property burned to the ground some years ago under suspicious circumstances and was subsequently replaced by a mobile home. CT Page 797
Income:
The income of each of the parties, as reflected in their most recent financial statement, is as follows: Plaintiff has a gross weekly income of $913 and a net of $525 from his employment as an administrative law judge for the employment security review board of the State of Connecticut. His additional net income from various union pensions, rental income and interest amounts to $765, resulting in his having a total weekly net income of $1236.
Defendant receives a gross weekly income of $600 and a net of $450 as manager of Acorn Acres. She has an additional weekly income of $12 from interest, giving her a total weekly net income of $462.
Fault:
As is so often the case, the parties are not in agreement concerning the causes for the breakdown of this 33 year marriage. Before stating its own conclusion, the court will briefly summarize the views of each of the parties with reference to the failure of their marriage.
Plaintiff's version:
"Once when we were on vacation in Kentucky, defendant claimed I snored and wouldn't sleep in the same room with me. Sex with her terminated entirely around 1979. At first it bothered me a lot. Prior to that we'd go out to dinner once a month. She'd go to Celtic's games and tennis tournaments with her girl friends but begged off going to Reno on a business-vacation trip with me." Plaintiff began a sexual relationship of short duration with another woman about 1981. In 1982, he began an affair with Bernadette Parks whom he later hired in 1984 to operate the family restaurant in Norwich. Miss Parks testified that she and the plaintiff were intimate at least once a week until 1988. Thereafter, about July, 1988 he began a relationship with Mrs. Bonnie La Bega whom he later hired as manager of the family restaurant as successor to Miss Parks. In that regard, plaintiff testified "She's married — I had no intention of a serious relationship with her."
Concerning his use of alcohol, plaintiff's comments were as follows: "I was not a daily drinker. Defendant never complained. After 1975, there were a lot of social occasions with the union — I drank more. Defendant made a note of my drinking on the calendar. I joked about it."
Summarizing his observations on his extra-marital CT Page 798 affairs, plaintiff stated: "I don't really think any conduct of mine had anything to do with the breakdown of the marriage. She didn't know about my affairs. At the campground I felt like a skunk at a lawn party. At least my affairs were with the opposite sex. I filed for the divorce."
Defendant's version:
Some observations of defendant concerning the failure of her marriage are noted: "I thought my marriage was good. It's hard to say what caused the breakdown. Plaintiff had a lot of free time and his paycheck. We had a common goal — to retire to Vermont. We always went to bed together at the start. Sex continued after 1980 but not a lot, ceasing about 1985. I never refused him. He refused me in 1989 — he wouldn't let me stay in the bed. He was out a lot while I was running the camp and restaurant. After he became business manager for the union about 1976 he began staying evenings in Hartford. I'd wait up for him until 2:00 a.m. — sometimes it would be light when he returned. He would have been drinking. This happened almost every night."
In response to plaintiff's statement that defendant's girlfriends were not heterosexual, defendant testified as follows: "These women were teachers with whom I worked. I played tennis with them once a week. Afterward we'd all go to the Yantick River Inn for lunch and then go home. Plaintiff brought us the tickets for the Celtics games and the Virginia Slims tennis tournaments. I asked plaintiff to go but he wouldn't. Once our group went to Myrtle Beach for golf — plaintiff bought me my clubs. Another time six couples went on a snowmobile trip to Vermont, plaintiff said his work prevented him from going so I went alone — number 13."
Defendant's feelings about the dissolution can perhaps be summarized in her following testimony: "I don't know what else I could have done. I trusted him and he trusted me. Now I find out what he's been doing for thirty years."
After having observed the parties throughout five days of trial and after having sifted and weighed all the evidence, the court finds the testimony of defendant to be completely credible and that the fault for the breakdown of this marriage of more than thirty years lies completely with the plaintiff.
Health:
Both of the parties are in apparent good health. During the early years of the marriage defendant under went a hysterectomy. CT Page 799
Conclusions:
After weighing carefully all of the factors recited in Sec. 46b-81c C.G.S. and after giving particular attention to what it considers to be the predominating factors, i.e., the length of the marriage, the disparity in income of the parties, the causes for the dissolution, and the contribution of each of the parties in the acquisition, preservation, or appreciation in value of their marital estate, this court finds on all of the evidence that plaintiff is entitled to 40% of the marital estate as determined by the court and defendant to 60% thereof.
V. The Distribution of the Marital Estate to the Parties in Accordance with the findings in Article IV
The court having previously determined that the gross marital estate is valued at $1,681,094, it now establishes plaintiff's 40% interest at $672,438 and defendant's 60% interest at $1,008,656.
The following allocations of property are made in accordance with these findings:
Plaintiff $672,438 — 40%
Total equity in P.D.Q. Restaurant at 783 W. Thames St., Norwich, etc., including stock $149,100
Full interest in 15 acres of vacant land Lake St., Bozrah, CT 180,000
Full interest in 357 Acres and improvements at Wallingford Pond Rd., E. Wallingford, VT 155,000
Bank accounts as per his financial affidavit 3,300
Stocks and bonds " " " " 64,000
I.R.A. " " " " 19,000
Silver, asbestos settlement, disputed claim of loss at P.D.Q. restaurant through fire 6,900
Gun collection, coin collection, tools —
Antiques as per exhibit B on plaintiff's claims for relief dated 11-26-91 and attached hereto. — CT Page 800
Union pension —
Amount due from defendant 95,138 -------- $672,438
Defendant $1,008,656 — 60%
Full interest in family farmhouse and 3 acres at #57 Lake St., Bozrah, CT $138,000
Full interest in Acorn Acres — 103 acres and buildings, improvements and stocks 840,000
Full interest in Christmas Tree lot — 10 acres on Lake St., Bozrah, CT 45,000
Bank accounts as per defendant's financial affidavit 9,754
Life insurance (C.S.V.) as per defendant's financial affidavit 1,181
Two I.R.A.'s as per defendant's financial affidavit 37,303
Cash (as per defendant's financial affidavit) 195
Acorn Acres equipment (as per defendant's financial affidavit) 16,000
1990 Buick Riviera (as per defendant's financial affidavit) 11,923
1986 Jeep —
Acorn Acres bank balance 4,438
Household furniture, furs, jewelry and all except Exhibit B — ---------- $1,103,794 Less amount due plaintiff 95,138 ---------- $1,008,656
EXHIBIT B
Occasional table, large ball and claw feet CT Page 801
Victorian mahogany settee, serpentine front, blue satin upholstery
Two (2) mahogany lamp tables, marble tops
One (1) mahogany coffee table, marble tops
One (1) banquet table, black cherry, drop leaf, rope legs
One (1) platform rocker, orange velvet upholstery
Four (4) antique pictures
Two (2) vases, tall carnival glass
One (1) large antique painting
Brass frame
Three (3) small antique pictures
One (1) medium sized painted picture
VI. Supplemental Orders Relating to the Distribution of the Marital Estate in accordance with the provisions
A. Plaintiff is ordered to convey to defendant all of his right, title, and interest in the real estate allocated to defendant in Article V supra i.e., the home together with 3 acres Acorn Acres (103 acres) and the Christmas Tree lot (10 acres) together with any interest he may have in Acorn Acres Inc. Said conveyance shall be made free and clear of any lien or incumbrance on said real estate, in particular any lien on said property resulting from a union dispute involving plaintiff.
B. Defendant is ordered to convey to plaintiff all her right, title and interest in premises known as No. 783 West Thames Street, Norwich, CT together with any interest including stock she may have in the restaurant located on said premises known as P.D.Q.'s Inc. In turn, plaintiff shall hold defendant harmless concerning any mortgage or other incumbrance on said premises.
Defendant shall also convey to plaintiff all her interest in 357 acres of land with the building and improvements thereon situated in E. Wallingford, VT. Plaintiff in turn will hold defendant harmless relative to any expenses or consequences resulting from a fire on said property CT Page 802 and insurance proceeds received therefrom.
C. Defendant is ordered to give plaintiff her promissory note in the amount of $95,138 which note shall be secured by a mortgage on Acorn Acres (103 acres). Said note shall bear interest at the rate of 6% per annum and shall be payable in the following manner.
By the payment of the sum of $25,000 together with accrued interest two years from date hereof, and by the payment of a similar sum of $25,000 together with accrued interest annually thereafter until January 9, 1997 at which time all then remaining balances of principal and interest shall be fully due and payable.
D. The parties shall execute all documents necessary to carry all the orders of this court in particular those required in the transfer of stock in Acorn Acres, Inc. and P.D.Q.'s Inc. to the designated owner.
E. The parties shall share equally the cost of any survey of the Bozrah real estate, including any survey required to carry out the orders of this court with reference to the distribution of the Bozrah real estate. The parties shall also share equally the cost to date of any litigation resulting from a zoning dispute involving the Town of Bozrah and Acorn Acres and of any attorney's fees incurred in the preparation of a lease of P.D.Q. Restaurant to the new tenant.
F. As previously ordered, plaintiff shall be solely entitled to any proceeds received as a result of a lawsuit concerning fire damage at P.D.Q.'s Restaurant, but defendant shall bear no responsibility for any debt due Bonnie Le Bega nor for any mortgage payments, real estate taxes, liquor license, utilities, insurance or other expenses incurred by plaintiff to date with reference to said property. (excepting her share of the legal fees incurred in the preparation of the P.D.Q. lease detailed in E above.)
G. In the event the various transfers of real estate by the parties in order to carry out the orders of the court have not been effectuated by March 1, 1992, then in that event the transfers shall thereupon become effective in accordance with the provisions of Sec. 46b-81 C.G.S.
VII Other Orders
A. Because of the previous orders of the court concerning the distribution of the marital estate, no award of alimony or counsel fees is made to either party. Similarly, no order CT Page 803 concerning the maintenance of life insurance is made.
B. Plaintiff shall assist defendant in procuring medical/health insurance through the exercise of her Cobra rights and any other rights provided legally divorced spouses under the State of Connecticut Medical Benefits Plan, but at defendant's sole cost and expense.
C. Plaintiff shall have sole title to and possession of two dogs, one a Beagle and the other an English Springer, both obtained from his mother. Defendant shall also deliver to plaintiff all pedigree papers and similar documents concerning said dogs.
E. Each of the parties shall be solely responsible for all liabilities shown on his or her financial affidavit and shall hold the other party harmless in that regard, except that the court makes no order concerning a debt to the I.R.S. in the amount of $6,554 shown in plaintiff's financial affidavits.
JOHN D. BRENNAN, STATE TRIAL REFEREE.